# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KEMERIA AHMED BESHIR,

    Plaintiff,

      v.

ERIC H. HOLDER, JR., Attorney General
of the United States, et al.

    Defendants.

Civil Action No. 10-652 (JDB)

## MEMORANDUM OPINION

    Plaintiff Kemeria Ahmed Beshir, an asylee from Ethiopia, brings this lawsuit against the Attorney General, the Secretary of the Department of Homeland Security ("DHS"), the Director of the FBI, the Director of the United States Citizenship and Immigration Services ("USCIS"), and other USCIS officials. Beshir claims that defendants have unreasonably delayed the adjudication of her Form I-485 application to adjust her immigration status to that of a lawful permanent resident and have unlawfully failed to elevate her application to USCIS headquarters personnel. Before the Court is [37] defendants' third motion for summary judgment. Upon careful consideration of the motion and the parties' memoranda, the applicable law, and the entire record, the Court will dismiss Beshir's complaint for lack of subject-matter jurisdiction and will deny defendants' motion as moot.

## FACTUAL BACKGROUND

    The facts and history of this case have been set forth in the Court's prior opinions and orders.[1] Beshir is an Ethiopian citizen currently residing in the United States pursuant to a grant of asylum decided on March 26, 2003. Defs.' Statement of Material Facts Not in Dispute

---

[1] Judge Urbina entered the Memorandum Opinions and Orders denying defendants' two previous motions for summary judgment. The case was reassigned to Judge Bates in April 2012, after Judge Urbina's retirement.

("Defs.' Stmt.") [ECF No. 37-1] ¶ 1.  In spring 2004, Beshir filed a Form I-485 application for adjustment of status to become a legal permanent resident.  <u>Id.</u> ¶ 2.  USCIS denied her application on February 28, 2008, after finding her inadmissible under section 212(a)(3)(B)(i)(I) of the Immigration and Nationality Act ("INA"), codified at 8 U.S.C. § 1182(a)(3)(B)(i)(I), which renders "inadmissible" for permanent residency status any alien who "engaged in a terrorist activity."  Defs.' Stmt. ¶ 9.  USCIS found Beshir inadmissible under this provision because of statements she made in her asylum application indicating that she supported the Oromo Liberation Front ("OLF"), an organization that USCIS has determined falls within the definition of a Tier III terrorist organization.  <u>Id.</u> ¶¶ 7-9.

In spring 2008, Beshir filed a motion to reopen her adjustment application.  <u>Id.</u> ¶ 11. USCIS granted her request, reopened her application on or about April 30, 2008, and then placed it on hold pursuant to a new USCIS policy.  <u>Id.</u> ¶¶ 11, 12.  The new policy stemmed from USCIS's March 26, 2008 Memorandum (the "2008 USCIS Memorandum"), which "instruct[ed] the withholding of adjudication of cases . . . that could potentially benefit" from an expanded authority to exempt Tier III groups from terrorism-related inadmissibility grounds.  <u>Id.</u> ¶¶ 6, 10. The referenced exemption authority is found at 8 U.S.C. § 1182(d)(3)(B)(i), which permits the Secretary of State or the Secretary of Homeland Security, "in such Secretary's sole unreviewable discretion," to exempt certain aliens who otherwise fall within the terrorism-related inadmissibility provisions of section 1182(a)(3)(B).  8 U.S.C. § 1182(d)(3)(B)(i).  This discretionary exemption authority was broadened by the Consolidated Appropriations Act of 2008 to allow "the Secretary to not apply the definition of a Tier III . . . terrorist organization . . . to a group that falls within the scope of that definition," and to allow "the Secretary to exempt most of the terrorist-related inadmissibility grounds delineated at . . . 8 U.S.C. § 1182(a)(3)(B) as

they apply to individual aliens." Defs.' Stmt. ¶¶ 5, 6. Due to this expanded exemption authority, the 2008 USCIS Memorandum instructed USCIS personnel to place on hold certain adjustment applications that could potentially benefit from future exemptions:

> Because new exemptions may be issued by the Secretary in the future, until further notice[,] adjudicators are to withhold adjudication of cases in which the only ground(s) for referral or denial is a terrorist-related inadmissibility provision(s) and the applicant falls within one or more of the below categories . . . (2) Applicants who are inadmissible under the terrorist-related provisions of the INA based on any activity or association that was <u>not under duress</u> relating to any other Tier III organization[.]

Ex. Q to Am. Compl., 2008 USCIS Memorandum [ECF No. 17, ECF No. 1-1]. Pursuant to this policy, USCIS determined that Beshir may benefit from a future exemption, and her adjustment application was placed on hold. Defs.' Stmt. ¶¶ 10-12.

On February 13, 2009, USCIS issued revised policies on the adjudication of cases involving terrorist-related inadmissibility grounds (the "2009 USCIS Memorandum"). <u>Id.</u> ¶ 10. The 2009 USCIS Memorandum did not lift the hold on the adjudication of Beshir's case. <u>Id.</u> ¶ 12. It did, however, provide additional instructions regarding cases placed on hold:

> If the adjudicating office receives a request from the beneficiary and/or attorney of record to adjudicate a case on hold per this policy (including the filing of a mandamus action in federal court) . . . the case should be elevated through the chain of command to appropriate Headquarters personnel. Guidance will be provided by USCIS headquarters on whether or not the case should be adjudicated.

Ex. P to Am. Compl., 2009 USCIS Memorandum [ECF No. 17, ECF No. 1-1]; Defs.' 3d Mot. for Summ. J. ("Defs.' 3d MSJ") [ECF No. 37] at 15; Pl.'s Opp'n [ECF No. 38] at 6, 12. Beshir's attorney of record sent a letter on January 31, 2010 to the USCIS Director of the Nebraska Service Center requesting that "further action be taken" in Beshir's case, Ex. N to Am. Compl., Jan. 31, 2010 Letter [ECF No. 17; ECF No. 1-1], but USCIS appears not to have "elevated" Beshir's application "through the chain of command," Pl.'s Opp'n at 6-7, 12.

Over the last several years, the Secretary of Homeland Security has exercised her exemption authority and exempted from terrorist-related inadmissibility qualifying aliens who provided "material support to the All India Sikh Students' Federation—Bittu Faction"; took part in "activities or associations relating to the All Burma Students' Democratic Front"; and "received military training under duress or . . . solicited funds or membership under duress." Defs.' Stmt. ¶¶ 13-15. Defendants have determined that no exemptions currently apply to Beshir and, consequently, the adjudication of her reopened application remains on hold pursuant to USCIS policy. Id. ¶¶ 12, 17.

## PROCEDURAL BACKGROUND

After waiting approximately two years for a decision on her adjustment application, Beshir filed her initial complaint in this Court on April 27, 2010. See Compl. [ECF No.1]. Shortly thereafter, defendants sought dismissal of Beshir's complaint for lack of jurisdiction and, in the alternative, moved for summary judgment. See Defs.' Mot. to Dismiss or for Summ. J. [ECF No. 2]. Judge Urbina denied the motion to dismiss for lack of jurisdiction and denied without prejudice defendants' alternative motion for summary judgment. See Jan. 24, 2011 Order [ECF No. 5]; Jan. 24, 2011 Mem. Op. [ECF No. 6]. On March 23, 2011, USCIS interviewed Beshir in conjunction with her adjustment application. Defs.' Stmt. ¶ 16. Defendants then filed a second motion for summary judgment. See Defs.' 2d Mot. for Summ. J. [ECF No. 11]. Judge Urbina denied the motion without prejudice and granted Beshir leave to file an amended complaint to show that she had standing. See Mar. 9, 2012 Order [ECF No. 14]; Mar. 9, 2012 Mem. Op. [ECF No. 15]. Beshir filed an amended complaint on April 9, 2012. See Am. Compl. [ECF No. 17].

On August 17, 2012, DHS published a notice announcing a recent exercise of the Secretary's exemption authority under 8 U.S.C. § 1182(d)(3)(B)(i).  See 77 Fed. Reg. 49,821 (Aug. 17, 2012).  The Court granted the parties' requests to stay proceedings for several weeks to allow time for USCIS to determine if the exemption applied to Beshir.  See Aug. 30, 2012 Stip. [ECF No. 25]; Nov. 5, 2012 Stip. [ECF No. 29].  In a joint status report filed at the conclusion of the stay, defendants stated that "[d]uring the review process . . . USCIS discovered information which suggests that the OLF [the association with which Beshir is associated] may not be eligible for the exemption."  Nov. 19, 2012 Status Report [ECF No. 30] at 2.  Defendants asked the Court to extend the stay in Beshir's case because USCIS was "still conducting its review process," but was "unable to provide an estimate of when" it would be finished.  Id.  Beshir opposed defendants' request to continue the stay, see id., and the Court let the stay expire.  As of the date of this Opinion, Beshir has not received a decision on her adjustment application.

In her amended complaint, Beshir asks the Court to compel defendants to adjudicate her adjustment application within ninety days.  See Am. Compl. ¶¶ 36-41.  She does not argue that a terrorist-related inadmissibility exemption currently applies to her or that defendants have failed to complete some administrative task necessary to process her application.  Rather, her claim is simply that defendants are taking an unreasonable amount of time to adjudicate her application. See id.  She also claims that defendants have unlawfully failed to elevate her case "through the chain of command to appropriate Headquarters personnel" pursuant to the 2009 USCIS Memorandum, and argues that they should be compelled by the Court to apply that policy.  Pl.'s Opp'n at 7 ("[Beshir] at the very least has a clear right to have the hold on her case reviewed by USCIS Headquarters.").

Defendants assert that the adjudication of Beshir's case has been delayed because it "is subject to extended processing due to the potential for high-level decision making that could affect her case" and argue that Beshir lacks a judicially enforceable right to demand that the government "prematurely conclude" this process. Defs.' 3d MSJ. at 1-2. Moreover, defendants argue, the adjudication of Beshir's adjustment application has not been unreasonably delayed. Id. Defendants also contend that the 2009 USCIS Memorandum represents internal policy guidance, not a binding regulation that the Court can compel them to apply. Id. at 14-16.

Because this Court has not yet determined whether an affirmative basis for subject-matter jurisdiction exists over Beshir's claims, it will do so now. In so doing, the Court will amend the earlier opinion in this case holding that the INA's jurisdiction-stripping provision, 8 U.S.C. § 1252(a)(2)(B)(ii), does not preclude judicial review. See Jan. 24, 2011 Mem. Op. Because the Court finds that it lacks subject-matter jurisdiction over Beshir's claims, it will not reach the parties' summary judgment arguments on the reasonableness of the delay in the adjudication of Beshir's adjustment application.

## STANDARD OF REVIEW

This Court is of limited jurisdiction, possessing "only that power authorized by Constitution and statute." Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994). The Court can dismiss a complaint sua sponte for lack of jurisdiction at any time. Fed. R. Civ. P. 12(h)(3); see, e.g., Jerez v. Republic of Cuba, 777 F. Supp. 2d 6, 15 (D.D.C. 2011). Although the Court must construe the complaint liberally, a plaintiff bears the burden of establishing the elements of federal jurisdiction. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). "[W]here necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's

resolution of disputed facts." Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).

Additionally, although there is a "strong presumption in favor of judicial review of administrative action," INS v. St. Cyr, 533 U.S. 289, 298 (2001), there is also a heightened need for "judicial deference to the Executive Branch . . . in the immigration context where officials exercise especially sensitive political functions," INS v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999) (internal quotation marks and citation omitted).

## ANALYSIS

Beshir asserts that this Court has subject-matter jurisdiction over her claims under 28 U.S.C. § 2201 et seq. (the Declaratory Judgment Act); 28 U.S.C. § 1331 (the federal question statute); 5 U.S.C. §§ 555(b), 701 et seq., 706 (the Administrative Procedure Act); and 28 U.S.C. § 1361 (the Mandamus Act). Am. Compl. ¶ 1(a). The Declaratory Judgment Act, however, "is not an independent source of federal jurisdiction." Schilling v. Rogers, 363 U.S. 666, 678 (1960) (internal citation omitted); accord C&E Servs., Inc. of Washington v. D.C. Water and Sewer Auth., 310 F.3d 197, 201 (D.C. Cir. 2002). To consider a claim under the Declaratory Judgment Act, a federal court must have jurisdiction under another federal statute. Schilling, 363 U.S. at 678. The federal question statute also does not stand alone. It provides federal courts with subject-matter jurisdiction only in cases arising under some other source of federal law. 28 U.S.C. § 1331. A federal statute, like the Administrative Procedure Act ("APA"), can provide the basis for federal question jurisdiction.

The APA provides that federal courts shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). However, the APA does not apply where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). The Supreme Court has clarified that "the only agency action that can be compelled under the APA is action legally

required . . . . Thus, a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a <u>discrete</u> agency action that it is <u>required</u> to take." <u>Norton v. S. Utah Wilderness Alliance</u>, 542 U.S. 55, 63-64 (2004); <u>accord</u> <u>Kaufman v. Mukasey</u>, 524 F.3d 1334, 1338 (D.C. Cir. 2008). The APA therefore does not provide a basis for jurisdiction over a claim that an agency failed to take a discretionary action.

The APA also does not apply, and thus does not provide a basis for federal question jurisdiction, where a statute at issue "precludes judicial review." 5 U.S.C. § 701(a). Relevant here, the INA's jurisdiction-stripping provision, 8 U.S.C. § 1252, provides that, "[n]otwithstanding any other provision of law," no court shall have jurisdiction to review "any . . . decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the [decision whether to grant asylum]." 8 U.S.C. § 1252(a)(2)(B). This jurisdiction-stripping provision dovetails with the jurisdictional limitations of the APA: the APA does not provide a basis for jurisdiction over discretionary agency action, and the INA prohibits jurisdiction over discretionary agency action.[2]

Another potential basis for jurisdiction here is the Mandamus Act, which independently provides federal courts with jurisdiction to "compel an officer or employee of the U.S. or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. Like the APA, however, mandamus is appropriate only where "a clear nondiscretionary duty" is at issue. <u>Pittston Coal Grp. v. Sebben</u>, 488 U.S. 105, 121 (1988) (quoting <u>Heckler v. Ringer</u>, 466 U.S. 602, 616 (1984)). "[T]he standards for obtaining relief [through mandamus and through the

---

[2] The INA's jurisdiction-stripping provision is slightly narrower, however, because it specifies that the discretionary agency action in question must also be "specified under this subchapter." 8 U.S.C. § 1252(a)(2)(B). The subchapter referred to is "Title 8, Chapter 12, Subchapter II, of the United States Code, codified at 8 U.S.C. §§ 1151-1381 and titled 'Immigration.'" <u>Kucana v. Holder</u>, 558 U.S. 233, 239 n.3 (2010).

APA] are essentially the same." <u>Viet. Veterans of Am. v. Shinseki</u>, 599 F.3d 654, 659 n.6 (D.C. Cir. 2010) (citing <u>In re Core Commc'ns Inc.</u>, 531 F.3d 849, 855 (D.C. Cir. 2008)).

As discussed below, because the pace of the adjudication of Beshir's application is discretionary, the Court lacks jurisdiction over Beshir's claim that defendants have unreasonably delayed adjudication. Similarly, because the 2009 USCIS Memorandum is internal policy guidance and not a binding regulation, the Court lacks jurisdiction over Beshir's claim that defendants failed to apply the memorandum.

## I.      <u>Jurisdiction Over Beshir's Unreasonable Delay Claim</u>

District courts are divided on the question whether the APA or the Mandamus Act provides a basis for jurisdiction—and whether the INA precludes jurisdiction—over claims that USCIS unreasonably delayed the adjudication of an adjustment application. <u>Compare</u> <u>Senbeta v. Mayorkas</u>, 2013 WL 2936316 (D. Minn. Jun. 14, 2013) (finding subject-matter jurisdiction exists); <u>Bemba v. Holder</u>, 930 F. Supp. 2d 1022 (E.D. Miss. 2013) (same); <u>Irshad v. Napolitano</u>, 2012 WL 4593391 (D. Neb. Oct. 2, 2012) (same), <u>with</u> <u>Namarra v. Mayorkas</u>, 924 F. Supp. 2d 1058 (D. Minn. 2013) (finding a lack of subject-matter jurisdiction); <u>Seydi v. USCIS</u>, 779 F. Supp. 2d 714 (E.D. Mich. 2011) (same). The courts of this district are similarly split. <u>Compare</u> <u>Geneme v. Holder</u>, 935 F. Supp. 2d 184 (D.D.C. 2013) (finding subject-matter jurisdiction exists); <u>Liu v. Novak</u>, 509 F. Supp. 2d 1 (D.D.C. 2007) (same), <u>with</u> <u>Singh v. Napolitano</u>, 710 F. Supp. 2d 123 (D.D.C. 2010) (finding a lack of subject-matter jurisdiction); <u>Orlov v. Howard</u>, 523 F. Supp. 2d 30 (D.D.C. 2007) (same); <u>Tao Luo v. Keisler</u>, 521 F. Supp. 2d 72 (D.D.C. 2007) (same). What divides these courts on the issue of jurisdiction is whether the pace of processing adjustment applications is discretionary.

The two federal appellate courts that have addressed the issue have not created any consensus. The Eighth Circuit in Debba v. Heinauer, 366 F. App'x 696 (8th Cir. 2010), affirmed a district court decision that "apparently concluded that it had subject-matter jurisdiction . . . [and] granted summary judgment for [defendants], holding that it would 'refrain from imposing its own judicially constructed deadline' on the processing of [plaintiff's] adjustment application." Id. at 698-99 (quoting Debba v. Heinauer, 2009 WL 146039, at *4 (D. Neb. Jan. 20, 2009)). That court did not conclude whether jurisdiction was proper because it found that, whether or not there was jurisdiction, the plaintiff had not established that the delay in adjudication was unreasonable. Id. at 699. The Fifth Circuit, on the other hand, found that neither the APA nor the Mandamus Act provided jurisdiction over a claim of unreasonable delay in adjudication and that the INA foreclosed any such jurisdiction. Bian v. Clinton, 605 F.3d 249, 255 (5th Cir. 2010), vacated as moot, 2010 WL 3633770 (5th Cir. Sept. 16, 2010) (concluding that Congress "expressly precluded judicial review of the USCIS's pace of adjudication when the agency acts within its discretion and pursuant to the regulations that the agency deems necessary for carrying out its statutory grant of authority"). The D.C. Circuit has not opined on the issue.

As discussed below, the plain language of the relevant federal statutes, the absence of a congressionally mandated timeline, and the national security considerations implicated by the adjudication process all support the conclusion that the pace of adjudicating Beshir's adjustment application is discretionary. Moreover, to the extent that Beshir argues that the delay represents a "refusal" to adjudicate her application, thus proffering a possibly nondiscretionary action over which the Court could have jurisdiction, her argument is unavailing.

## A. Plain Language of 8 U.S.C. §§ 1159(b) and 1255(a)

Two analogous statutes, 8 U.S.C. § 1159(b) and 8 U.S.C. § 1255(a), are relevant to the adjudication of adjustment applications, and their plain language supports the conclusion that the pace of adjudication is discretionary.[3]   Section 1159(b) provides that "[t]he Secretary of Homeland Security or the Attorney General, in the Secretary's or the Attorney General's discretion and under such regulations as the Secretary or the Attorney General may prescribe, may adjust . . . the status of any alien granted asylum."   Similarly, section 1255(a) declares that "[t]he status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence."   Hence, according to these statutes, an alien's status may be adjusted "in the Secretary's or the Attorney General's discretion and under such regulations as the Secretary or the Attorney General may prescribe," 8 U.S.C. § 1159(b) (emphasis added), and by "the Attorney General, in his discretion and under such regulations as he may prescribe," 8 U.S.C. § 1255(a) (emphasis added).   These provisions make clear that the statutes grant discretion not only over the decision to adjust an alien's status but also over the promulgation of regulations to create the process by which an alien's status may be adjusted.   See Labaneya v. USCIS, 2013 WL 4582203, at *8 (E.D. Mich. Aug. 29, 2013) (finding that section 1255(a) "constitutes a grant of discretion over the process by which applications for adjustment of status are adjudicated"); Orlov, 523 F. Supp. 2d at 34 (finding that "[t]he plain meaning of [section 1255(a)] therefore is to grant USCIS the power and the discretion to promulgate regulations governing how (and when) adjustment decisions are

---

[3] Defendants cite only to section 1159(b), whereas Beshir cites only to section 1255(a).  See Defs.' 3d MSJ at 10; Am. Compl ¶¶ 4-5.  Section 1159(b) appears to be more applicable to this case because it specifically applies to "any alien granted asylum."  8 U.S.C. § 1159(b).  Nonetheless, the Court will consider both statutes because the relevant language is analogous.

made"); <u>Singh</u>, 710 F. Supp. 2d at 129-30 (finding that section 1159(b) granted the Secretary "discretion to promulgate regulations that she feels are necessary to exercise her authority to grant permanent resident status to an asylee").

Notwithstanding the clear statements in sections 1159(b) and 1255(a) that the Attorney General and the Secretary have the authority to prescribe regulations governing the process of adjudication, some courts have concluded that because the pace of adjudication is not specifically mentioned, it is therefore not discretionary. <u>See, e.g.</u>, <u>Mohammed v. Frazier</u>, 2008 WL 360778, at *6 (D. Minn. Feb. 8, 2008) (finding that "[t]here is no explicit provision" granting discretion over the pace of adjudication; thus pace is not discretionary); <u>Liu</u>, 509 F. Supp. 2d at 7-9 (finding that the INA does not specifically address the pace of application processing; thus pace is not discretionary). This Court is not persuaded. Granting the Attorney General and the Secretary the discretion to promulgate regulations governing the process of adjudication necessarily includes a grant of discretion over the pace of adjudication. "Otherwise, the grant of discretion would be illusory, given that courts could drastically alter the regulations prescribed by dictating what pace of adjudication the regulations must permit." <u>Labaneya</u>, 2013 WL 4582203, at *8; <u>see also</u> <u>Namarra</u>, 924 F. Supp. 2d at 1064 ("[C]ommit[ting] the adjustment decision itself, as well as the authority to promulgate regulations governing the adjudication process, to the Secretary's discretion, but exclud[ing] from the Secretary's discretion the time required to arrive at the adjustment decision, merely puts form over substance."). And because the pace of adjudication is discretionary, neither the APA nor the Mandamus Act provides a basis for this Court to assert jurisdiction over Beshir's claim of unreasonable delay. <u>See, e.g.</u>, <u>S. Utah Wilderness Alliance</u>, 542 U.S. at 63-64 (holding that a court cannot, under the APA, compel an agency to act unless there is a nondiscretionary, specific act—<u>i.e.</u>, a discrete action

that the agency is required to take); Pittston Coal Group, 488 U.S. at 121 (holding that mandamus is only appropriate where defendant owes petitioner "a clear nondiscretionary duty").

Moreover, the INA's jurisdiction-stripping provision, which precludes judicial review of any "decision or action" for which the authority "is specified under this subchapter" to be "in the discretion of the Attorney General or the Secretary of Homeland Security," applies to the pace of adjudication of adjustment applications. 8 U.S.C. § 1252(a)(2)(B)(ii). Sections 1159(b) and 1255(a) specify that the process of adjudication, and hence the pace of adjudication, is discretionary. And these statutes clearly fall within the relevant "subchapter," i.e., 8 U.S.C. §§ 1151-1381. The remaining question then is whether the pace of adjudication is an applicable "decision or action." Plainly it is. The term "action" must encompass the discretionary pace at which the adjustment process proceeds because it encompasses the various other discretionary acts that constitute the process as a whole and that direct the pace of the process. See Safadi v. Howard, 466 F. Supp. 2d 696, 699 (E.D. Va. 2006) (finding that the term "action" in section 1252(a)(2)(B) "encompasses the entire process of reviewing an adjustment application, including the completion of background and security checks and the pace at which the process proceeds"). To hold otherwise would be inconsistent with "Congress' intent to confer on USCIS discretion over not just the adjustment of status decision but also the process employed to reach that result, and to exclude from judicial review the exercise of all that discretion." Id. Because the INA's jurisdiction-stripping provision applies to the pace of adjudication, then, it provides a barrier to any basis for judicial review over Beshir's claim.

A recent decision in this district relied on Kucana v. Holder, 558 U.S. 233 (2010), in reaching the opposite conclusion.[4] See Geneme, 935 F. Supp. 2d at 191-92 (holding that the

_____

[4] Judge Urbina's decision in this case denying defendants' motion to dismiss for lack of subject-matter jurisdiction also referenced Kucana when it discussed whether the pace of adjudication was "specified under the

13

INA's jurisdiction-stripping provision did not preclude judicial review over a claim of unreasonable delay in the adjudication of an adjustment application). For the following reasons, this Court is not persuaded by that court's reasoning. The issue in <u>Kucana</u> was whether a federal court had the authority to review the BIA's decision to deny a motion to reopen removal proceedings. 558 U.S. at 237-39. The authority for the BIA's decision was a regulation created by the Attorney General that placed "[t]he decision to grant or deny a motion to reopen . . . within the discretion of the [BIA]." <u>Id.</u> at 242 (citing 8 C.F.R. § 1003.2(a)). This authority was not codified in the INA or any other federal statute. <u>Id.</u> at 242-43. The Supreme Court "granted certiorari to decide whether the [INA's jurisdiction-stripping provision] applies not only to Attorney General determinations made discretionary by statute, but also to determinations declared discretionary by the Attorney General himself through regulation." <u>Id.</u> at 237. In deciding this issue, the Supreme Court explained that "Congress barred court review of discretionary decisions <u>only</u> when Congress itself set out the Attorney General's discretionary authority in statute." <u>Id.</u> at 247 (emphasis added). Accordingly, the Supreme Court concluded that, because the BIA's authority to grant or deny a motion to reopen was provided only within a regulation, not a statute, it was not covered by the INA's jurisdiction-stripping provision. <u>Id.</u> 252-53. Hence, the INA did not preclude judicial review of decisions on motions to reopen.

In stark contrast here, the discretionary process of adjusting the status of aliens is statutorily codified in sections 1159(b) and 1255(a). <u>Geneme</u> overlooks this essential point, and instead focuses on the Supreme Court's discussion of how an "adjunct ruling" that does "not direct the Executive to afford the alien substantive relief" is different from a "substantive decision," <u>see</u> <u>Kucana</u>, 558 U.S. at 247-48, concluding that "the Supreme Court held that

<hr />

subchapter" for the purposes of the INA's jurisdiction-stripping provision. <u>See</u> Jan. 24, 2011 Mem. Op. at 9-10. This Court has resolved that issue for itself here.

decisions on . . . motions [requesting an adjunct ruling] were subject to judicial review." Geneme, 935 F. Supp. 2d at 191-92 (explaining that the court had jurisdiction over a claim of unreasonable delay in adjudication because "an order that USCIS adjudicate [plaintiff's] application would not afford her substantive relief, but only ensure that she got a fair chance to have her claims heard in a timely manner").  The Supreme Court's discussion of substantive decisions versus adjunct rulings, however, was not the determining factor in its analysis.  Rather, the Supreme Court clearly stated that its "paramount" consideration was the fact that Congress had not codified the regulation at issue.  Kucana, 558 U.S. at 252 ("Finally, we stress a paramount factor in the decision we render today.  By defining the various jurisdictional bars by reference to other provisions in the INA itself, Congress ensured that it, and only it, would limit the federal courts' jurisdiction.  To read [section] 1252(a)(2)(B)(ii) to apply to matters where discretion is conferred on the Board by regulation, rather than on the Attorney General by statute, would ignore that congressional design.").

Kucana therefore does not stand for the proposition that a federal court has jurisdiction over any claim that would result in an adjunct ruling rather than a substantive decision.  Hence, although ordering defendants to adjudicate Beshir's application would be an adjunct ruling, that does not mean that Beshir's claim of unreasonable delay is subject to judicial review.  Kucana more clearly stands for the proposition that, in the context of the INA's jurisdiction-stripping provision, only statutes can confer grants of discretion that are shielded from judicial review. Here, Congress has set out the Secretary's and the Attorney General's discretionary authority over the process of adjudication—and hence the pace of adjudication—in statutes, shielding it from judicial review.  Kucana does not hold otherwise and hence Geneme is not persuasive.

### B. *Absence of a Congressionally Mandated Timeline*

The absence of a congressionally-imposed deadline or timeframe to complete the adjudication of adjustment applications also supports the conclusion that the pace of adjudication is discretionary and thus not reviewable by this Court. Judicial review "is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Heckler v. Chaney, 470 U.S. 821, 830 (1985); accord Sierra Club v. Jackson, 648 F.3d 848, 855 (D.C. Cir. 2011). Here, sections 1159(b) and 1255(a) provide no deadline by or timeframe within which the Attorney General or the Secretary of Homeland Security must complete the review of an application for adjustment status. "With no specific deadline in the statute, Congress has left to . . . administrative discretion the time in which [to] complete [the] review of such applications." Debba v. Heinauer, 2009 WL 146039, at *4 (D. Neb. Jan. 20, 2009), aff'd, 366 F. App'x 696 (8th Cir. 2010) (holding that the court "is not at liberty to construct and impose its own deadline").

As this Court has previously noted, "[i]f Congress intended to constrain the USCIS to adjudicate an application within a specific amount of time, this Court believes it would have provided a time limitation as it did in 8 U.S.C. § 1447(b), which provides that a determination on a naturalization application must be made within 120 days after an examination is conducted." Orlov, 523 F. Supp. 2d at 34. "In the absence of statutorily prescribed time limitations or statutory factors to guide USCIS in crafting regulations for the adjustment process, it is difficult to determine how the pace of processing an application could be anything other than discretionary." Id. at 35 (citing Mahaveer, Inc. v. Bushey, 2006 WL 1716723, at *3 (D.D.C. June 19, 2006) (concluding that, "by not providing any specific factors to guide the Attorney General in crafting such regulations [to govern the conditions of nonimmigrants' entry into the

United States], it can fairly be said that Congress intended the Attorney General to have full discretion in his or her decision making"); see also Zhang v. Chertoff, 2007 WL 1753538, at *4 (W.D. Va. Jun. 19, 2007) (explaining that "[i]f Congress had intended for the pace of adjudication of adjustment applications to be subject to judicial review, it could have expressly offered a standard with which to measure the lapse of time").

Beshir argues that 8 C.F.R. § 103.2(b)(18) creates a timeframe for the review and adjudication of adjustment applications placed on hold for terrorist-related inadmissibility under 8 U.S.C. § 1182(d)(3)(B)(i). Pl.'s Opp'n at 8-9. The Court disagrees. By its plain language, section 103.2(b)(18) applies only to applications where adjudication has been withheld because

> USCIS [has] determine[d] that an investigation has been undertaken involving a matter relating to eligibility or the exercise of discretion, where applicable, in connection with the benefit request, and that the disclosure of information to the applicant or petitioner in connection with the adjudication of the benefit request would prejudice the ongoing investigation.

8 C.F.R. § 103.2(b)(18) (emphasis added). Hence, this regulation is only relevant where there is an ongoing investigation that would be prejudiced by disclosures to the applicant. Neither party has alleged that situation exists here. Moreover, in support of this plain reading, the agency published the final version of the rule after the notice-and-comment period and included the following clarification in the supplementary information section:

> The purpose of this rule is to prevent the use of visa petition regulations to obtain information regarding criminal investigations which would not be discoverable in the normal course of an ongoing criminal investigation and to protect confidential informants, witnesses, and undercover agents connected with civil and criminal investigations.

Powers and Duties, 53 Fed. Reg. 26034 (July 11, 1988). Neither party has alleged that there is an ongoing criminal investigation or that confidential informants, witnesses, or undercover agents are in any way involved here. Thus, the stated purpose of this rule does not encompass

the situation faced by Beshir, and 8 C.F.R. § 103.2(b)(18) does not provide a timeframe for the adjudication of her application.[5] The parties have not suggested, and the Court has not found, any other possibly applicable timeframe in federal statutes or regulations.

Because no guidelines compel USCIS to adjudicate adjustment applications by or within a certain time, "plaintiff plainly cannot assert that USCIS has failed to adjudicate [her] application within a time period in which it was required to do so." Orlov, 523 F. Supp. 2d at 37. The absence of an applicable timeframe for the adjudication of adjustment applications supports the conclusion that the pace of adjudication is discretionary and that the Court lacks jurisdiction to hear Beshir's claim of unreasonable delay.

### C.  National Security Considerations

The national security considerations implicated by the adjudication of an adjustment application placed on hold because of terrorist-related inadmissibility further support the conclusion that the pace of adjudication is discretionary and thus not subject to judicial review. It is undisputed that USCIS has placed Beshir's application on hold because it found that she was ineligible for an adjustment of status pursuant to 8 U.S.C. § 1182(a)(3)(B)(i)(I) for providing material support to a terrorist organization. It is also undisputed that the authority given to the Secretary of State and the Secretary of Homeland Security to exempt individuals from terrorist-related inadmissibility is discretionary. See 8 U.S.C. § 1182(d)(3)(B)(i) (providing that the decision is within the "Secretary's sole unreviewable discretion"). It would be "incongruous to, on the one hand, insist that Defendants act promptly to adjudicate an application that can only

---

[5] Defendants have stated that they adhere to this interpretation, and the Court accordingly gives weight to it. See Auer v. Robbins, 519 U.S. 452, 461 (1997) (explaining that an agency's interpretation of its own regulations is controlling unless plainly erroneous or inconsistent with the regulation). Deference is appropriate even where the interpretation is advanced in the form of a legal brief, as long as there is "no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter." See id. at 462 (deferring to agency interpretation presented in a legal brief); accord Blackmon-Malloy v. U.S. Capitol Police Bd., 575 F.3d 699, 704-710 (D.C. Cir. 2009).

succeed through the exercise of the Secretary's discretionary authority, while at the same time advancing a theory of subject-matter jurisdiction that disavows the notion that the Secretary has been called upon to exercise her discretionary authority." <u>Seydi v. USCIS</u>, 779 F. Supp. 2d 714, 720 (E.D. Mich. 2011) (finding no jurisdiction).

Moreover, as appropriately noted by another court in this district, "[g]iven the national security implications of immigration regulation, the broad discretion afforded the Attorney General permits the agency to adjudicate applications <u>only</u> after conducting a careful and thorough investigation . . . . [I]n this context, the Court's insertion into that process would be inappropriate and could be detrimental to national security." <u>Tao Luo</u>, 521 F. Supp. 2d at 74 (citing <u>Safadi</u>, 466 F. Supp. 2d at 701); <u>see also</u> <u>Aguirre-Aguirre</u>, 526 U.S. at 425 (explaining that "judicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions" (internal quotation and citation omitted)).

### D. No Refusal to Adjudicate Beshir's Application

To the extent Beshir claims that defendants have "refused" to adjudicate her application, <u>see</u> Pl.'s Opp'n at 27 ("Defendants have willfully and unreasonably delayed in, and have refused to, adjudicate Plaintiff's reopened I-485"), and have thereby failed to perform an arguably nondiscretionary duty, her argument is unavailing because the facts and the record demonstrate otherwise. It is undisputed that Beshir's current adjustment application has been on hold since April 30, 2008 for the same reasons it was initially denied—terrorist-related inadmissibility— and that, as it currently stands, no exemptions apply. It is likewise undisputed that defendants have completed the ordinary steps necessary to process Beshir's adjustment application, including processing several fingerprint checks, completing preliminary background checks, and

conducting an in-person interview.  See Ex. 1 to Defs.' 3d MSJ, Gareth R. Cannan Decl. [ECF No. 37-1] ¶¶ 5, 10-12.  And defendants have explained that they are "withholding final adjudication due to the implementation of a legislatively enacted, high-level exemption process for which Beshir (or [OLF]) may potentially qualify," Defs.' Mot. at 30-31, and are "waiting for issuance of additional formal guidance that would affect [Beshir's] case and release it for adjudication," Defs.' Reply [ECF No. 39] at 6.

Unfortunately for Beshir and others similarly situated, it appears that Congress designed the exemption process to be deliberately time-consuming.  "[I]t requires consultation between the Secretary of State, the U.S. Attorney General, and the Secretary of Homeland Security. . . . It also requires research by law enforcement and intelligence agencies and various levels of vetting that precede the required coordination among the three Cabinet officials."  Defs.' Mot. at 23.  A district court in Minnesota aptly represented the situation when it described how

> [s]ufficient time is required for information-gathering and research by law enforcement and intelligence agencies. Further, the status and activities of a foreign organization are dynamic and fluid, and thus the time required for an inquiry into that organization must surely vary tremendously. For example, the Secretary's assessment of a particular Tier III terrorist organization may depend on, among other things: the changing political environment of the organization's country or region; shifting policies or leadership within the organization; whether the organization continues to be active and if so, in what sort of activities it engages; and ongoing concerns and goals of the United States with respect to its foreign policy.

Namarra, 924 F. Supp. 2d at 1065-66 (finding no jurisdiction over a claim of unreasonable delay in adjudication).  Defendants have demonstrated that they are actively considering any current exemptions that could be beneficial to Beshir.  Defs.' Reply at 3, 6.  For example, upon joint motion of the parties, this case was stayed for several weeks while defendants considered whether a recent exercise of exemption authority applied to Beshir.  See Aug. 30, 2012 Stip.; Nov. 5, 2012 Stip.

Defendants have also demonstrated that they are actively exempting applicable adjustment applications from terrorism inadmissibility when appropriate. Qualifying aliens who provided "material support to the All India Sikh Students' Federation—Bittu Faction"; took part in "activities or associations relating to the All Burma Students' Democratic Front"; and "received military training under duress or . . . solicited funds or membership under duress" have all been exempted from terrorist-related inadmissibility over the last several years. Defs.' Stmt. ¶¶ 13-15.

The Court agrees that Beshir has been subjected to a very long period of waiting—nearly six years since the initial hold was placed on her case on April 30, 2008. That is far from ideal. But defendants' actions do not indicate that they have refused to adjudicate Beshir's application.

## II.     Jurisdiction Over Beshir's Claim that Defendants Failed to Apply the 2009 USCIS Memorandum.

In addition to the claim that adjudication of her adjustment application has been unreasonably delayed, Beshir also asserts that USCIS unlawfully failed to elevate her application to USCIS headquarters pursuant to the following text from the 2009 USCIS Memorandum:

> If the adjudicating office receives a request from the beneficiary and/or attorney of record to adjudicate a case on hold per this policy (including the filing of a mandamus action in federal court) . . . the case should be elevated through the chain of command to appropriate Headquarters personnel. Guidance will be provided by USCIS headquarters on whether or not the case should be adjudicated.

Pl.'s Opp'n at 12 (citing the 2009 USCIS Memorandum). Beshir's attorney of record sent a letter to the USCIS Director of the Nebraska Service Center requesting that "further action be taken in [Beshir's] case," but Beshir asserts that her application does not appear to have been "elevated through the chain of command" at USCIS. Pl.'s Opp'n at 9-10. Defendants respond that Beshir has no legal basis to demand that consideration of her adjustment application be "elevated"

because the 2009 USCIS Memorandum "simply provides internal policy guidance" and is not binding on the agency. Defs.' 3d MSJ at 14-16. As discussed above, "the only agency action that can be compelled under the APA is that which is legally <u>required</u>." <u>S. Utah Wilderness Alliance</u>, 542 U.S. at 63. Similarly, mandamus is only appropriate where defendant owes petitioner "a clear nondiscretionary duty." <u>Pittston Coal Group</u>, 488 U.S. at 121. The question, then, is whether the 2009 USCIS Memorandum represents a legally required, <u>i.e.</u>, nondiscretionary, duty over which this Court may have jurisdiction, or simply a non-binding policy statement.

To determine whether an agency has issued a binding regulation or simply a statement of policy, courts in this Circuit are guided by two lines of inquiry. <u>See</u> <u>Wilderness Soc'y v. Norton</u>, 434 F.3d 584, 595-96 (D.C. Cir. 2006) (finding that the Management Policies of the National Park Service was a statement of internal policy rather than a binding rule). The first line of analysis focuses on the effects of the agency action, "asking whether the agency has '(1) impose[d] any rights and obligations,' or (2) 'genuinely [left] the agency and its decisionmakers free to exercise discretion.'" <u>Id.</u> (quoting <u>CropLife Am. v. EPA</u>, 329 F.3d 876, 883 (D.C. Cir. 2003)). "'[T]he language actually used by the agency' is often central to making such determinations." <u>Id.</u> (quoting <u>Cmty. Nutrition Inst. v. Young</u>, 818 F.2d 943, 946 (D.C. Cir. 1987)). The second line of analysis "'focuses on the agency's expressed intentions.'" <u>Id.</u> (quoting <u>CropLife Am.</u>, 329 F.3d at 883). "The analysis under this line of cases 'look[s] to three factors: (1) the [a]gency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency.'" <u>Id.</u> (citing <u>Molycorp, Inc. v. EPA</u>, 197 F.3d 543, 545 (D.C. Cir. 1999)).

For many of the same reasons highlighted by the D.C. Circuit when it found that the Management Policies of the National Park Service was simply a policy statement rather than a binding rule, see id. at 595-96, this Court concludes that the 2009 USCIS Memorandum is a non-binding policy statement. For example, the text does not use mandatory language, "such as 'will' and 'must,'" id. at 595, but instead uses the word "should." Nor was the text issued through notice-and-comment rulemaking under 5 U.S.C. § 553 of the APA. "'Failure to publish in the Federal Register is [an] indication that the statement in question was not meant to be a regulation since the [APA] requires regulations to be so published.'" Id. at 596 (quoting Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d 533, 538-39 (D.C. Cir. 1986)). Moreover, the 2009 USCIS Memorandum was never published in the Code of Federal Regulations. Id. (explaining that "[t]he real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations" (internal quotation marks and citation omitted)). USCIS's characterization of the 2009 USCIS Memorandum is also telling: the subject line indicates that the contents of the memorandum are "[r]evised guidance," not "revised rules" or "revised regulations."

In combination, these factors support the conclusion that the 2009 USCIS Memorandum is merely a statement of internal policy intended for use by USCIS field offices. Therefore, the 2009 USCIS Memorandum is not a binding rule or regulation, and the Court lacks jurisdiction over Beshir's claim that defendants failed to apply it.

## CONCLUSION

For the foregoing reasons, Beshir's complaint will be dismissed, and defendants' motion for summary judgment will be denied as moot. A separate Order accompanies this Memorandum Opinion.

_____
/s/
JOHN D. BATES
United States District Judge

Dated: <u>January 27, 2014</u>